UNITED STATES DISTRICT COURT
~~SOUTHERN~~ DISTRICT OF NEW YORK

JUDGE SULLIVAN

09 CV 10093

MBIA INSURANCE CORPORATION and LACROSSE
FINANCIAL PRODUCTS, LLC,

                          Plaintiffs,

             - against -

COÖPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A.; THE BANK OF NEW
YORK MELLON TRUST COMPANY, NATIONAL
ASSOCIATION, As Trustee Under an Indenture dated
November 23, 2004, and PARAGON CDO, LIMITED,

                          Defendants.

09-CV-_____

**COMPLAINT**



Plaintiffs MBIA Insurance Corporation ("MBIA") and LaCrosse Financial

Products, LLC ("LaCrosse"), by their attorneys Cadwalader, Wickersham & Taft LLP, for their

Complaint against defendants Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.

("Rabobank"), The Bank of New York Mellon Trust Company, National Association, as Trustee

under an Indenture dated November 23, 2004 ("BONY") and Paragon CDO, Limited ("Paragon"

and collectively with Rabobank and BONY, the "Defendants") allege, on information and belief,

as to all facts other than as to themselves, as follows:

### NATURE OF THIS ACTION

1.     Plaintiffs bring this action to seek relief from the effect of unlawful actions taken

by the Defendants that have improperly deprived Plaintiffs of important financial protections

negotiated as part of Plaintiffs' issuance of financial guaranty insurance and credit default swaps

in connection with a collateralized debt obligation ("CDO") transaction (the "Transaction").

Taking unfair advantage of its multiple roles in the Transaction, and in violation of the carefully

negotiated terms of the Transaction documents, defendant Rabobank constructed, and with the other defendants implemented, a scheme to improperly eliminate an existing first loss layer or deductible under the insurance and credit default swaps in case of certain losses in or to the referenced obligations.  These actions, taken in breach of the parties' agreements, without the required consent of or notice to MBIA, and in the midst of negotiations between Rabobank and MBIA, were reflective of Rabobank's purposeful effort, taken in bad faith, to impair MBIA's transaction rights and improperly enlarge MBIA's risk in the Transaction.

2.     Plaintiffs seek damages and a declaratory judgment with respect to (i) the breach by Rabobank of a Portfolio Management Agreement, dated November 23, 2004, between Paragon, as issuer, and Rabobank, as portfolio manager (the "Portfolio Management Agreement"); and (ii) the breach by BONY and Paragon of an Indenture, dated November 23, 2004 (as supplemented, amended or modified from time to time, the "Indenture"), by and among Paragon, as issuer, Paragon CDO, LLC, as co-issuer, and BONY (successor in trust to JPMorgan Chase Bank, National Association), as trustee (the "Trustee").[1]

3.     Paragon is the issuer in the CDO Transaction which is governed by the Indenture. In a CDO, a special purpose entity (generally referred to as the "issuer") is formed to (i) issue secured notes to investors and (ii) use the proceeds of that issuance to acquire an asset portfolio consisting of securities and/or swap agreements.  In a credit default swap agreement, the issuer acquires credit exposure to a portfolio of securities or derivative products in exchange for periodic payments to its counterparty, here LaCrosse.

4.     At the closing of the Transaction, Paragon and LaCrosse entered into separate credit default swap agreements with Rabobank.  Under a policy of financial guaranty insurance,

---

[1] Unless defined herein, capitalized terms used herein have the same meaning as the defined terms in the Indenture.

MBIA guaranteed LaCrosse's payment obligations to Rabobank under the LaCrosse swap agreement.

5.     Under the agreements, Plaintiffs and Paragon agreed to assume the risk of credit loss on a portion of a $1 billion portfolio of securities or other derivative assets held by Rabobank, in exchange for certain premium payments from Rabobank.   The Transaction documents refer to Rabobank's portfolio as the "Reference Portfolio" and each of the securities therein as a "Reference Obligation."  Plaintiffs' agreements and the CDO together operated in a manner similar to an insurance agreement, providing Rabobank with credit protection against the risk of defaults on the Reference Obligations which Rabobank held.

6.     Specifically, the swap agreements and the financial guaranty insurance provided (subject to their terms and conditions) that Paragon would cover approximately the first $125 million of any losses realized on the portfolio of Reference Obligations held by Rabobank, and Plaintiffs would cover up to $875 million of any additional losses realized on the Reference Portfolio.

7.     In the absence of an Event of Default under the Indenture, (i) Paragon had the right, under the Paragon Swap Agreement (as hereinafter defined), to direct Rabobank (as Swap Counterparty), to sell credit impaired Reference Obligations from the Reference Portfolio; and (ii) Rabobank, as portfolio manager under the Portfolio Management Agreement, had the right to direct Paragon to make this direction of sale. See Portfolio Management Agreement § 2(v).

8.     Rabobank thus served in multiple capacities in the Transaction which gave rise to certain conflicting rights and obligations, potentially at odds with MBIA's interests.

9.     To provide Plaintiffs appropriate protection from Rabobank's conflicting roles and the considerable control Rabobank could seek to exert over the Transaction, certain safeguards were negotiated by MBIA and built into the Transaction documents.

10.     Specifically, if the Reference Portfolio becomes distressed and an Event of Default occurs the Indenture provides that the right to sell the Collateral, including the Reference Obligations, may not be exercised unless certain conditions are met, including MBIA's approval of any such sale.  MBIA bargained for those approval rights so it could control any sales of Reference Obligations (and the potential realization of losses) after it became apparent that the Reference Portfolio was underperforming and losses over $125 million could result.

11.     Had MBIA not negotiated for and received such approval rights, upon a downturn in the market, Rabobank would have had the unfettered right to direct and control the sale of certain Reference Obligations, thereby accelerating the realization of losses and MBIA's payment obligations under the LaCrosse/MBIA Agreements (as hereinafter defined).

12.     On or about March 3, 2009, an Event of Default occurred under the Indenture (the "March Default") and BONY, as Trustee, provided notice thereof to Paragon and Rabobank. The March Notice of Default (as hereinafter defined) issued by BONY expressly recognized the obligation, pursuant to Section 5.5(a) of the Indenture, to retain the Collateral intact following an Event of Default "unless and until the conditions precedent to the sale and liquidation of the Collateral have been met."

13.     Following the March Default, Rabobank engaged MBIA in discussions regarding a potential financial resolution of MBIA's position and interests under the credit default swap agreements between Rabobank and LaCrosse and other transactions.

14.     Notwithstanding the Event of Default and the ongoing negotiations with MBIA, Rabobank breached the Portfolio Management Agreement and Paragon breached the Indenture when Rabobank (in its capacity as Portfolio Manager) directed Paragon to instruct Rabobank (as Swap Counterparty) to sell Reference Obligations without notifying Plaintiffs, much less obtaining the required approval of MBIA.   BONY also breached the Indenture by failing to retain the Reference Obligations intact as required under the Indenture.

15.     Upon information and belief, these wrongful sales resulted in over $105 million in losses in the Reference Portfolio.

16.     As a result of Rabobank's breach of the Portfolio Management Agreement and Paragon's and BONY's breach of the Indenture, Plaintiffs' potential payment obligations to Rabobank, which would be triggered after the realization of $125 million in Reference Portfolio losses, were wrongfully accelerated.

17.     Plaintiffs by this action seek damages and a declaration that (i) Rabobank has breached the Portfolio Management Agreement by directing and executing the sale of Reference Obligations after the occurrence of the March Default without the prior consent of MBIA; (ii) Paragon has breached the Indenture by directing the sale of the Reference Obligations after the occurrence of the March Default without the prior consent of MBIA; (iii) BONY has breached the Indenture by failing to retain the Reference Obligations intact after the occurrence of the March Default; and (iv) any losses incurred as a result of the unauthorized sales of Reference Obligations cannot be applied to reduce the First Loss Amount (as hereinafter defined) and thereby accelerate Plaintiffs' potential payment obligations to Rabobank pursuant to the LaCrosse/MBIA Agreements.

18.    Plaintiffs by this action also seek a permanent injunction, once the portion of the $125 million cushion improperly reduced is fully restored, barring Defendants from directing and executing any further sales of the Collateral without obtaining the prior consent of MBIA in accordance with the Indenture.

## THE PARTIES

19.    Plaintiff MBIA is a stock insurance company organized under the laws of the State of New York, with its principal place of business in Armonk, New York. At all relevant times, MBIA provided, among other things, financial guaranty insurance in connection with derivatives and structured finance transactions, such as CDO transactions.

20.    Plaintiff LaCrosse is a Delaware limited liability company with its principal place of business in New York. LaCrosse was established in December 1999 to act as a counterparty for structured derivative products, primarily credit default swaps. MBIA, through financial guaranty policies, guarantees the obligations of LaCrosse under its credit default swaps. LaCrosse's sole member is LaCrosse Financial Products Member, Inc., a Delaware corporation with its principal place of business in New York.

21.    Defendant Rabobank is a cooperative banking organization incorporated in The Netherlands. Rabobank is a foreign banking organization which transacts business within New York State.

22.    Defendant BONY is a nationally chartered trust company which provides trust and custody services to issuers of debt, institutional investors and individuals. BONY maintains its principal place of business in Los Angeles, California. BONY transacts business within New York State.

-6-

23.   Defendant Paragon is an exempted limited liability company incorporated under the laws of the Cayman Islands. Paragon is a special purpose entity formed for the sole purpose of effectuating the Transaction. Upon information and belief, Paragon's ultimate members are citizens or subjects of a foreign state.

## JURISDICTION AND VENUE

24.   This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

25.   The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

26.   Venue is proper in this District under 28 U.S.C. § 1391(a) and (c) because a substantial part of the events giving rise to these claims occurred in this District. Defendants also conduct operations from offices in New York. Further, Defendants have consented to jurisdiction in the United States District Court for the Southern District of New York.

## FACTUAL ALLEGATIONS

### I.   Background

27.   This dispute involves the rights and obligations of Rabobank, BONY, Paragon, MBIA and LaCrosse under the following agreements executed in connection with the Transaction: (i) the swap agreement, dated November 23, 2004, by and between Paragon and Rabobank (the "Paragon Swap Agreement"); (ii) the swap agreement, dated November 23, 2004, by and between LaCrosse and Rabobank (the "LaCrosse Swap Agreement"); (iii) the financial guaranty insurance policy, dated November 23, 2004 and bearing policy number 45335, issued by MBIA for the benefit of Rabobank (the "MBIA Insurance Policy") and an insurance

agreement between LaCrosse and MBIA; (iv) the Indenture and (v) the Portfolio Management

Agreement (collectively, the "Transaction Documents").

## II.    The Transaction

28.    The Transaction at issue here is a CDO transaction that closed on November 23,

2004. In a CDO, a special purpose entity (generally referred to as the "issuer") is formed to (i)

issue secured notes to investors and (ii) use the proceeds of that issuance to acquire an asset

portfolio consisting of securities and/or swap agreements. In a credit default swap agreement,

the issuer acquires credit exposure to a portfolio of securities or derivative products in exchange

for periodic payments or premiums. The issuer's asset portfolio and the cash flows it generates

serve as collateral for the issuer's secured payment obligations to the noteholders and are the

source of funds available to satisfy those obligations. The rights and obligations of the issuer are

principally set forth in the indenture governing the Transaction.

29.    At the closing of the Transaction, Paragon, as the issuer, (i) issued $125 million of

secured notes, (ii) used the proceeds of the issuance to acquire $125 million of securities (the

"Repo Eligible Investments") under a repurchase agreement (the "Repurchase Agreement"), (iii)

entered into the Paragon Swap Agreement with Rabobank whereby Paragon acquired credit

exposure to the Reference Portfolio in exchange for periodic premium payments and (iv) entered

into certain related contracts.

30.    The Indenture provides that all of Paragon's assets, including its rights under the

Repo Eligible Investments and the Paragon Swap Agreement, constitute collateral (the

"Collateral") granted to the Trustee for the benefit of the Secured Parties (as such term is defined

under the Indenture). See Indenture (Granting Clauses)

-8-

31.    Pursuant to the Indenture, the Trustee is required to distribute all cash-flows generated by the Collateral at the end of each quarter in accordance with a schedule (the "Priority of Payments") set forth in the Indenture.  See Indenture § 11.1.  The Priority of Payments provides that, under certain circumstances, the Trustee must deposit a portion of those cash-flows in an account held by Paragon (the "Reserve Account").  See Indenture § 11.1.  The funds in the Reserve Account remain available to Paragon to satisfy payment obligations that become due in the future.  See Indenture § 10.6.

III.    **The Paragon Swap Agreement**

32.    The Paragon Swap Agreement, among other things, generally provides that, in exchange for certain premium payments from Rabobank, Paragon will pay Rabobank a contractually defined amount if certain negative "credit events" occur with respect to a Reference Obligation (e.g., if the issuer of the Reference Obligation defaults on a required payment).

33.    The Paragon Swap Agreement also provides that Paragon has the right to direct Rabobank to sell Reference Obligations under certain circumstances.  If any such sale results in a gain, Rabobank will pay the amount of the gain to Paragon, and, if any such sale results in a loss, Paragon will pay the amount of the loss to Rabobank.

34.    Paragon's ability to satisfy its payment obligations under the Paragon Swap Agreement at any given time is generally limited to:  (i) funds held in the Reserve Account and (ii) the net value of any Repo Eligible Investments held under the Repurchase Agreement.

35.    The Indenture provides that, if amounts become due and owing under the Paragon Swap Agreement, Paragon will first draw upon funds in the Reserve Account, and if such funds are insufficient to satisfy its obligations, Paragon will sell the requisite amount of Repo Eligible

Investments in accordance with the Repurchase Agreement. Indenture, § 6.21(b). At the beginning of the Transaction, there was $0 in the Reserve Account, and, as set forth above, Paragon acquired $125 million of Repo Eligible Investments.

**IV.    The LaCrosse Swap Agreement and The MBIA Insurance Policy**

36.    To account for the risk that losses on the Reference Portfolio might exceed the sum of $125 million and any amounts ultimately deposited in the Reserve Account, Rabobank, MBIA and/or LaCrosse executed the following agreements at the closing of the Transaction: (i) the LaCrosse Swap Agreement; (ii) the MBIA Insurance Policy; and (iii) the insurance agreement, dated November 23, 2004, between LaCrosse and MBIA (the "Insurance Agreement" and together with the MBIA Insurance Policy and the LaCrosse Swap Agreement, the "LaCrosse/MBIA Agreements").

37.    Read together, the LaCrosse/MBIA Agreements generally provide (subject to the terms and conditions therein) that: (i) Rabobank will pay LaCrosse and LaCrosse will pay MBIA (via payments passing through LaCrosse) a periodic fee and (ii) if negative "credit events" occur with respect to a Reference Obligation <u>and</u> the aggregate losses in the Reference Portfolio resulting from prior "credit events" exceed a specified threshold (the "First Loss Amount"), Plaintiffs will pay Rabobank a contractually defined amount. The potential payment obligations are capped at $875 million.

38.    At any given time, the First Loss Amount is equal to $125 million, <u>plus</u> the balance of the Reserve Account, <u>plus</u> the amount of any gains realized if Rabobank sells a Reference Obligation at Paragon's direction, <u>minus</u> the amount of any losses realized if Rabobank sells a Reference Obligation at Paragon's direction. Accordingly, if a Reference Obligation is sold and such sale results in a loss, the First Loss Amount is decreased by the

amount of that loss.  As the First Loss Amount decreases from $125 million towards $0 it becomes more likely that Plaintiffs will be obligated to pay Rabobank under the LaCrosse/MBIA Agreements.

## V.    Rabobank's Rights and Obligations Under the Portfolio Management Agreement

39.     Pursuant to the Portfolio Management Agreement, Rabobank, as Portfolio Manager, was appointed by Paragon to provide certain advisory services in relation to the Reference Portfolio, including advising Paragon whether Reference Obligations permitted to be removed pursuant to the Swap Agreement should be removed and the timing of such removals. See Portfolio Management Agreement § 2(a)(v).

40.     However, Rabobank's rights under the Portfolio Management Agreement, including its rights to direct the sale of Reference Obligations, are restricted by the terms of the Indenture.

41.     Pursuant to the Portfolio Management Agreement, Rabobank agreed to "comply with the Swap Agreement, the Indenture and this Agreement affecting the duties and functions that have been delegated to it thereunder [and to] perform its obligations thereunder and hereunder in good faith . . . ."  See Portfolio Management Agreement § 2(b).

42.     Rabobank further agreed that "[it] shall not knowingly and intentionally, or with reckless disregard for its obligations hereunder take any action which would . . . (v) result in [Paragon] or the Co-Issuer violating the terms of . . . the Indenture . . ."  See Portfolio Management Agreement § 2(e).

43.     In the event that a conflict arises between the Portfolio Management Agreement and Indenture or the Paragon Swap Agreement, the Portfolio Management Agreement expressly

provides that the provisions of the Indenture or the Paragon Swap Agreement shall control. See Portfolio Management Agreement § 13(d).

44.    Pursuant to Section 13(a) of the Portfolio Management Agreement, MBIA (as Bank Credit Counterparty) is an express third party beneficiary of the Portfolio Management Agreement.

## VI.    Limitation on the Right to Direct and Execute the Sale of Reference Obligations Following an Event of Default Under the Indenture

45.    Due in part to the ability provided to Rabobank and Paragon to reduce the First Loss Amount by directing sales of Reference Obligations, MBIA bargained for and received the right under the Indenture following an Event of Default to control whether Reference Obligations may be sold after it became apparent that the Reference Portfolio was underperforming and significant losses were probable.

46.    If an Event of Default occurs and is continuing, Section 5.5(a) of the Indenture prevents Paragon and Rabobank from exercising their rights to direct the sale or liquidation of any Reference Obligations and requires that BONY, as Trustee, retain the Reference Obligations intact unless either (i) the Trustee determines the anticipated proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full amounts then due and unpaid on all of the securities issued by Paragon as well as certain other specified amounts, and MBIA agrees with such determination or (ii) MBIA directs the sale or liquidation of the Collateral.

47.    Specifically, Section 5.5(a) of the Indenture provides:

> Notwithstanding anything to the contrary herein, if an Event of Default shall have occurred and be continuing, the **Trustee shall retain the Collateral securing the Notes intact,** collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of

Payments and the provisions of Article X, Article XII and Article XVI **unless:**

(i) the Trustee, pursuant to Section 5.5(c), determines that the anticipated proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal, interest, and amounts payable pursuant to clauses (i) through (xiii) of Section 11.1(a) **and a Majority of the Controlling Class agrees with such determination; or**

(ii) **the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Controlling Class** (and, unless the Swap Counterparty and each Hedge Counterparty will be paid the full amount due to it under the Swap Agreement and each Hedge Agreement (respectively), such Swap Counterparty or Hedge Counterparty (as applicable), assuming, for this purpose, that the Swap Agreement and each Hedge Agreement (as applicable) has been terminated by reason of the occurrence of an event of default thereunder by the Issuer), **with respect to each Event of Default, direct such sale and liquidation of the Collateral . . . .**

(emphasis added). Such restriction on the sale of any portion of the Collateral is confirmed throughout the Indenture, including in Sections 5.3 and 5.4 of the Indenture.

48.    Collateral, as referenced in Section 5.5(a), is defined in the Granting Clauses of the Indenture to include the Paragon Swap Agreement and Paragon's rights thereunder, and all payments made or to be made thereon or with respect thereto and any collateral granted to the Issuer thereunder.

49.    Section 5.5(c) of the Indenture also provides that "[i]n determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain a bid price from two or more dealers (Independent of the Portfolio Manager and its Affiliates) for each Reference Obligation contained in the Reference Portfolio." Reference Obligations are defined in the Indenture as the reference obligations which comprise the Reference Portfolio, as such term is

defined in the Paragon Swap Agreement.   See Indenture § 1.1 (definitions of Reference

Obligations and Reference Portfolio).

50.    As defined in the Indenture, MBIA is the Controlling Class (including, without

limitation, any references to 25%, a majority, a Majority, 66 2/3% or 100% of the Controlling

Class).

51.    Specifically, the Indenture provides that "if the Reference Obligation Unfunded

Amount is greater than zero and the [MBIA Insurance Policy] has not been terminated, [MBIA]

shall, except as otherwise provided in this definition, be the Controlling Class (including, without

limitation, any references to 25%, a majority, a Majority, 66 2/3% or 100% of the Controlling

Class)".   See Indenture § 1.1 (definitions of Controlling Class and Bank Credit Counterparty).

The MBIA Insurance Policy has not been terminated and the Reference Obligation Unfunded

Amount is greater than zero.   See Indenture (definition of Reference Obligation Unfunded

Amount).   MBIA accordingly is the Controlling Class.

52.    Pursuant to Section 14.8 of the Indenture, MBIA (as Bank Credit Counterparty) is

an express third party beneficiary of the Indenture.

**VII.    The March Default**

53.    Due to a decline in the credit quality of the Reference Portfolio, an Event of

Default occurred on or about March 3, 2009.

54.    Pursuant to Section 5.1(c) of the Indenture, an Event of Default shall occur upon

"the failure on any Measurement Date to maintain a Class AB Overcollateralization Percentage

of at least 92%."

55.    As of the most recent Measurement Date in or around March 3, 2009, the Class

AB Overcollateralization Percentage fell below 92%.   Accordingly, pursuant to Section 6.2 of

the Indenture, BONY, as Trustee issued a Notice of an Event of Default dated March 3, 2009

notifying, among others, Paragon and Rabobank that an event of default had occurred under Section 5.1(c) of the Indenture (the "March Notice of Default").

56.    Among other things, the March Notice of Default provided the requisite notice that "[p]ursuant to Section 5.5(a) of the Indenture, if an Event of Default shall have occurred and be continuing, the Trustee shall retain the Collateral securing the Notes intact . . . unless and until the conditions precedent to the sale and liquidation of the Collateral have been met." Accordingly, Rabobank, Paragon and BONY were all well aware of the express restrictions placed on sales of Collateral following the occurrence of an Event of Default.

## VIII.    Breach Of The Portfolio Management Agreement and The Indenture

57.    As the March Default has continued, and is continuing, pursuant to the Indenture, Rabobank and Paragon may no longer direct the sale of any Reference Obligations and BONY must retain the Reference Obligations intact unless first complying with the conditions precedent set out in Section 5.5(a) of the Indenture.

58.    Notwithstanding Section 5.5(a) of the Indenture, in or around July and August 2009, Rabobank (as Portfolio Manager), while in the midst of a negotiation with MBIA  to resolve disputes concerning the Transaction, wrongfully directed the sale of certain Reference Obligations from the Reference Portfolio without satisfying the conditions set forth in Section 5.5(a).

59.    Specifically, Rabobank (as Portfolio Manager) directed the sales of Reference Obligations without first ensuring that: (i) BONY has made a determination that the anticipated proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full amounts then due and unpaid on the securities issued by Paragon as well as certain other specified amounts, and MBIA has agreed with such determination; or (ii) MBIA has directed the sale or liquidation of the Collateral.

-15-

60. Pursuant to Section 12(f) of the Indenture, upon Rabobank's instruction to sell certain Reference Obligations, Paragon is obligated to "within two Business Days verify whether such [sale] would comply with the requirements under the [Paragon Swap Agreement] . . . [and] notify the Trustee, the Swap Counterparty [(Rabobank)], and the Portfolio Manager [(Rabobank)] of the results of its verification."

61. Pursuant to the LaCrosse Swap Agreement, Rabobank was in turn obligated to deliver to Plaintiffs (via LaCrosse) "each notice it receives under the [Paragon Swap Transaction]." See LaCrosse Swap Agreement (Notices under CDO Transaction). However, no such notice was ever provided.

62. Upon Rabobank's instruction (as Portfolio Manager) to sell certain Reference Obligations, Paragon (as Issuer and swap counterparty) in turn directed Rabobank, pursuant to the Paragon Swap Agreement, to sell certain Reference Obligations. Like Rabobank, Paragon made this direction without first obtaining the consent of MBIA. Paragon's actions were therefore in breach of Section 5.5(a) if the Indenture.

63. Rabobank (as Swap Counterparty) complied with Paragon's instructions and in July and August 2009 wrongfully sold certain Reference Obligations.

64. Having failed to comply with its obligations under Section 5.5(a) of the Indenture to retain the Collateral securing the Notes intact following an Event of Default, BONY has breached the Indenture.

65. Rabobank (in its capacity as Portfolio Manager), by directing Paragon to sell the Reference Obligations and (as Swap Counterparty) executing the sale of the Reference Obligations, each without the prior approval or direction of MBIA, has knowingly caused the violation of Section 5.5(a) of the Indenture, and consequently breached Sections 2(b) and 2(e) of

the Portfolio Management Agreement in which Rabobank agreed to comply with the terms of the Indenture.

66.     Plaintiffs did not learn of Defendants' breaches until they received a copy of a periodic report from the Trustee, dated August 31, 2009.

67.     According to the Trustee's August 31, 2009 report, at Paragon's and Rabobank's direction, Rabobank sold over $114 million of Reference Obligations for proceeds of approximately $9 million, resulting in approximately $105 million in losses. Upon information and belief, the First Loss Amount was decreased from $125 million to $20 million as a result of Defendants' breaches.

68.     Despite due demand, Defendants have refused to recognize the improper nature of their sale of Reference Obligations, and Defendants have refused to agree to increase the First Loss Amount by the amount of the losses of the improper sale of Reference Obligations.

69.     Additional write-downs have resulted in further losses that have improperly reduced the First Loss Amount to $0, thereby accelerating MBIA's payment obligations under the LaCrosse/MBIA Agreements.

70.     On or about September 16, 2009, pursuant to Section 11(c) of the Portfolio Management Agreement, MBIA (in its capacity as the Controlling Class), directed the Issuer to terminate and remove Rabobank as Portfolio Manager for cause by providing written notice of such termination and removal to Rabobank and the Trustee.

71.     As a result of Defendants' improper actions, demands are expected to be made to MBIA to pay claims under the Transaction documents even though MBIA's $125 million loss cushion should be in place to prevent such claims.

72.    As a result of Defendants' improper actions, claims will continue to be made to MBIA (even though the $125 million cushion should have precluded such claims) absent relief from this Court.

73.    As a result of Defendants' improper actions, MBIA has suffered damages through the elimination of its loss cushion and the expected submission of claims under the Transaction that it should not have to pay.

## FIRST CLAIM FOR RELIEF
(Breach of Contract against BONY, Paragon and Rabobank)

74.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 73 hereof, as if fully set forth herein.

75.    On or about November 23, 2004, BONY (successor in trust to JPMorgan Chase Bank, National Association) and Paragon entered into the Indenture and Rabobank entered into the Portfolio Management Agreement.

76.    MBIA is an express third party beneficiary of the Indenture and the Portfolio Management Agreement, pursuant to Section 14.8 of the Indenture and Section 13(a) of the Portfolio Management Agreement, respectively.

77.    MBIA has satisfied all conditions and performed all of its obligations under all of the Transaction Documents, including the Indenture and the Portfolio Management Agreement.

78.    Due to a decline in the credit quality of the Reference Portfolio, an Event of Default occurred on or about March 3, 2009 and is continuing.

79.    As the March Default has continued, and is continuing, pursuant to the Indenture, Rabobank and Paragon may no longer direct the sale of any Reference Obligations and BONY must retain the Reference Obligations intact unless first complying with the conditions precedent set out in Section 5.5(a) of the Indenture.

80.    Notwithstanding Section 5.5(a) of the Indenture, in or around July and August 2009, Rabobank (as Portfolio Manager) wrongfully directed the sale of certain Reference Obligations from the Reference Portfolio without satisfying the conditions set forth in Section 5.5(a).

81.    Upon Rabobank's instruction (as Portfolio Manager) to sell certain Reference Obligations, Paragon (as Issuer and swap counterparty) in turn directed Rabobank, pursuant to the Paragon Swap Agreement, to sell certain Reference Obligations.    Like Rabobank, Paragon made this direction without first obtaining the consent of MBIA.    Paragon's actions were therefore in breach of Section 5.5(a) if the Indenture.

82.    Rabobank (as Swap Counterparty) complied with Paragon's instructions and in July and August 2009 wrongfully sold certain Reference Obligations.

83.    Having failed to comply with its obligations under Section 5.5(a) of the Indenture to retain the Collateral securing the Notes intact following an Event of Default, BONY has breached the Indenture.

84.    Rabobank (in its capacity as Portfolio Manager), by directing Paragon to sell the Reference Obligations and (as Swap Counterparty) executing the sale of the Reference Obligations, each without the prior approval or direction of MBIA, has knowingly caused the violation of Section 5.5(a) of the Indenture, and consequently breached Sections 2(b) and 2(e) of the Portfolio Management Agreement in which Rabobank agreed to comply with the terms of the Indenture.

85.    Having failed to comply with their obligations to provide Plaintiffs with notice of such sales, Paragon and Rabobank have further breached the Indenture and the LaCrosse Swap Agreement.

86.    By reason of the foregoing, MBIA has suffered and will continue to suffer damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
(Declaratory Judgment against BONY, Paragon and Rabobank)

87.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 86 hereof, as if fully set forth herein.

88.    By reason of the foregoing, an actual justiciable controversy exists between the parties.

89.    By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment declaring the parties' rights under the Transaction Documents as follows:

(a)    Rabobank has breached the Portfolio Management Agreement by directing and executing the sale of Reference Obligations after the occurrence of the March Default without the prior consent of MBIA;

(b)    Paragon has breached the Indenture by directing the sale of the Reference Obligations after the occurrence of the March Default without the prior consent of MBIA;

(c)    BONY has breached the Indenture by failing to retain the Reference Obligations intact after the occurrence of the March Default; and

(d)    any losses realized as a result of the unauthorized sales of Reference Obligations cannot be applied to reduce the First Loss Amount and thereby accelerate the potential payment obligations to Rabobank pursuant to the LaCrosse/MBIA Agreements.

## THIRD CLAIM FOR RELIEF
(Negligence against BONY)

90.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 89 hereof, as if fully set forth herein.

91.    Pursuant to Section 5.5(a) of the Indenture, BONY has a duty following an Event of Default to retain the Reference Obligations intact unless either (i) BONY determines the anticipated proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full amounts then due and unpaid on all of the securities issued by Paragon as well as certain other specified amounts, and MBIA agrees with such determination or (ii) MBIA directs the sale or liquidation of the Collateral.

92.    By negligently and willfully failing to retain the Collateral securing the Notes intact following an Event of Default, BONY has breached its duties under Section 5.5(a) of the Indenture.

93.    By reason of the foregoing, MBIA has suffered and will continue to suffer damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
(Permanent Injunction against BONY, Paragon and Rabobank)

94.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 93 hereof, as if fully set forth herein.

95.    Plaintiffs will suffer irreparable harm because, once the portion of the $125 million loss cushion improperly reduced is restored, additional sales of Reference Obligations by Defendants will result in further losses that will improperly reduce the First Loss Amount to $0, thereby accelerating the potential payment obligations under the LaCrosse/MBIA Agreements.

96.    Plaintiffs' remedies at law to redress Defendant's breaches are inadequate as the continuing and repetitive harm suffered by Plaintiffs is not quantifiable and is not compensable by monetary damages.

97.    By reason of the foregoing, Plaintiffs are entitled to a permanent injunction enjoining  Defendants, once the portion of the $125 million cushion improperly reduced is

restored, from directing and executing any further sales of the Collateral without obtaining the prior consent of MBIA in accordance with the Transaction Documents.

## RELIEF DEMANDED

WHEREFORE Plaintiffs MBIA and LaCrosse respectfully request that this Court enter an Order awarding:

(a)    as to the First Claim for Relief, a judgment in Plaintiffs' favor in an amount to be determined at trial;

(b)    as to the Second Claim for Relief, a judgment in Plaintiffs' favor, declaring that:

(i)    Rabobank has breached the Portfolio Management Agreement by directing and executing the sale of Reference Obligations after the occurrence of the March Default without the prior consent of MBIA;

(ii)    Paragon has breached the Indenture by directing the sale of the Reference Obligations after the occurrence of the March Default without the prior consent of MBIA;

(iii)    BONY has breached the Indenture by failing to retain the Reference Obligations intact after the occurrence of the March Default; and

(iv)    any losses realized as a result of the unauthorized sales of Reference Obligations cannot be applied to reduce the First Loss Amount and thereby accelerate the payment obligations to Rabobank pursuant to the LaCrosse/MBIA Agreements.

(c)    as to the Third Claim for Relief, a judgment in Plaintiffs' favor in an amount to be determined at trial;

(d)    as to the Fourth Claim for Relief, a permanent injunction enjoining Defendants, once the portion of the $125 million cushion improperly reduced is restored, from directing and executing any further sales of the Collateral without obtaining the prior consent of MBIA in accordance with the Transaction Documents;

(e)    an award to MBIA, pursuant to Section 5.15 of the Indenture, of its reasonable costs, attorneys' fees and expenses incurred in connection with this action; and

(f)    such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          December 9, 2009

                              CADWALADER, WICKERSHAM & TAFT LLP

                              By: _____
                                  Howard R. Hawkins, Jr.
                                  William J. Natbony
                                  Michael N. Abdo

                              One World Financial Center
                              New York, New York  10281
                              Telephone: (212) 504-6000

                              *Attorneys for Plaintiffs*
                                  *MBIA Insurance Corporation and LaCrosse*
                                  *Financial Products, LLC*