UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____
DATE FILED: 3/25/11

№ 09 Civ. 10093 (RJS)

MBIA INSURANCE CORP. & LACROSSE FINANCIAL PRODUCTS, LLC,

Plaintiffs,

VERSUS

COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., *ET AL.*,

Defendants.

OPINION AND ORDER
March 25, 2011

RICHARD J. SULLIVAN, District Judge:

Plaintiffs MBIA Insurance Corporation ("MBIA") and LaCrosse Financial Products, LLC ("LaCrosse") bring this diversity action for breach of contract by Defendants Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") and Bank of New York Mellon Trust Company, N.A. ("BONY" or the "Trustee") and negligence by BONY. These claims arise from Defendants' sale of asset-backed securities called Reference Obligations from a synthetic collateralized debt obligation ("CDO") entered into by the parties. The sale of these securities at a significant loss accelerated Plaintiffs' obligations to make credit protection payments to Rabobank under the terms of certain credit default swaps and financial guarantee agreements insuring the CDO. Plaintiffs allege that these sales breached their contractual rights because they were conducted without the required consent and notice.

Presently before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, the Court denies Plaintiffs' motions in their entirety, and grants Defendants' motions on all claims except Plaintiffs' breach of contract claim against Rabobank for failure to provide notice.

I. Background

A. Facts[1]

1. Parties

Plaintiff MBIA is a New York stock insurance company that provides, among other things, financial guaranty insurance in connection with derivatives and structured finance transactions, such as CDO transactions. (Pls.' 56.1 ¶ 1.) Plaintiff LaCrosse is a limited liability company that acts as a counterparty for structured derivative products, primarily credit default swaps, essentially as the seller of protection. (*Id.* ¶ 2.) MBIA, through financial guaranty policies, guarantees the obligations of LaCrosse under its credit default swaps. (*Id.*)

Defendant Rabobank is a Dutch cooperative banking organization that transacts business within New York State. (Pls.' 56.1 ¶ 3.) In this case, Rabobank entered into various contracts that imposed distinct obligations on its New York and London branches. Specifically, as explained below, Rabobank served as Portfolio Manager to the CDO through its New York branch, but owned the Reference Obligations and acted as the buyer of protection for them through its London branch. Accordingly, for the sake of clarity and notwithstanding that Rabobank as a whole is the party to these contracts, the Court refers to Rabobank acting through its New York branch as "Rabobank New York" and Rabobank acting through its London branch as "Rabobank London."

Defendant BONY is a trust company that, among other things, provides trust services to issuers of debt. (*Id.* ¶ 4.) BONY served as a trustee under an indenture for the CDO.

Paragon CDO Limited ("Paragon") is a special purpose entity formed to issue notes for the CDO. Although Paragon was named as a defendant in the Complaint, it was dismissed from this action by Stipulation and Order of Dismissal entered on February 17, 2010. (Doc. No. 24.) Pursuant to the Stipulation, Paragon agreed to be bound by any final non-appealable declaratory judgment or injunction awarded in this action. (*Id.*)

2. The Terms of the CDO

By way of background, in a CDO transaction, a special purpose entity – here Paragon – issues securities entitling the purchasers to a portion of the cash flows that either (a) are generated by a portfolio of asset-backed securities acquired by the issuer; or (b) are derived from contractual arrangements into which the issuer enters, such as credit default swaps, that provide it with benefits and risk exposure similar to

[1] The following facts are taken from the pleadings, the parties' Local Rule 56.1 Statements, the affidavits submitted in connection with the instant motion, and the exhibits attached thereto. The facts are undisputed unless otherwise noted. Where only one party's 56.1 Statement is cited, the facts are taken from that party's statement, and the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact. The abbreviation "Pls.' 56.1" refers to Plaintiffs' Local Rule 56.1 statement in support of their motion for summary judgment, while "Pls.' BONY Opp'n 56.1" and "Pls.' RB Opp'n 56.1" refer to Plaintiffs' Local Rule 56.1 statements in opposition to BONY's and Rabobank's cross-motions for summary judgment, respectively. Similarly, "BONY's 56.1" and "BONY's Opp'n 56.1" refer, respectively, to BONY's Local Rule 56.1 statements in support of its cross-motion for summary judgment and in opposition to Plaintiffs' motion. Rabobank's combined Local Rule 56.1 submission in support of its cross-motion and in opposition to Plaintiffs' motion is referred to as "RB's 56.1."

those it would possess if it actually owned a portfolio of asset-backed securities. The former type of CDO is called a "cash" CDO, while the latter is a "synthetic" CDO. (*See generally* Declaration of William J. Fenrich, dated April 15, 2010, Doc. No. 44 ("Fenrich Decl."), Ex. L.)

On November 23, 2004, the parties executed a series of agreements (collectively, the "Transaction Documents") setting up the framework for a synthetic CDO pursuant to which Paragon issued $125 million in notes.[2] The credit default swaps and other derivative contracts backing the CDO allowed Paragon's noteholders to gain market and credit exposure to the performance of a $1 billion portfolio (the "Reference Portfolio") owned by Rabobank London that contained a pool of asset-backed securities termed Reference Obligations. (BONY's 56.1 ¶ 13; RB's 56.1 ¶ 74.)

The Transaction Documents include (i) an indenture (the "Indenture"), among Paragon as issuer, Paragon CDO, LLC as co-issuer, and BONY as successor trustee (the "Trustee") (*see* Affidavit of Anthony McKiernan, dated March 15, 2010, Doc. No. 31 ("First McKiernan Aff."), Ex. A); (ii) a swap agreement between Paragon and Rabobank London (the "Paragon Swap Agreement" or "PSA") (*see id.*, Ex. B); (iii) a swap agreement between LaCrosse and Rabobank London (the "LaCrosse Swap Agreement" or "LSA") (*see id.*, Ex. C);[3] (iv) a financial guaranty insurance policy issued by plaintiff MBIA for the benefit of Rabobank London and an insurance agreement between LaCrosse and MBIA (collectively the "MBIA Insurance Agreement") (*see id.*, Ex. D); (v) a Portfolio Management Agreement between Paragon and Rabobank New York as Portfolio Manager (the "Portfolio Management Agreement" or "PMA") (*see id.*, Ex. E); and (vi) a Collateral Administration Agreement among Paragon, Rabobank New York as Portfolio Manager, and BONY as collateral administrator (*see id.*, Ex. F). MBIA is an express third party beneficiary of the Indenture and the Portfolio Management Agreement. (Pls.' 56.1 ¶ 7; Indenture § 14.8; PMA § 13(a).)

The Indenture defines the duties of the Trustee and sets out the payment priorities to the CDO investors. The Indenture also expressly contemplates other ancillary agreements, including the Paragon Swap Agreement and the Portfolio Management Agreement that create the overall structure of the CDO. As set forth in more detail below, these agreements and other assets were granted by Paragon to the Trustee as "Collateral" to secure Paragon's obligations. (*See* Indenture, Granting Clauses.)

a. The Paragon and LaCrosse Swap Agreements

Pursuant to the Paragon Swap Agreement, Rabobank London owns the

[2] Plaintiffs at times take issue with terming the CDO, and the nature of the risks and benefits acquired by Paragon's noteholders, as "synthetic," in an apparent bid to preserve their argument that Paragon acquired certain interests in the Reference Obligations. (Pls.' RB Opp'n 56.1 ¶¶ 74, 81.) Plaintiffs otherwise admit that Paragon did not purchase the Reference Obligations (*id.* ¶ 71) and that the CDO in this case is synthetic (Pls.' BONY Opp'n 56.1 ¶ 5).

[3] The Paragon and LaCrosse Swap Agreements each contain three integrated documents: The ISDA Master Agreement, a Schedule, and a Confirmation ("Conf."). The Confirmation provides the transaction-specific terms of the swap and prevails in case of any inconsistency with the ISDA Master Agreement and Schedule. (*See* PSA ISDA Master Agreement § 1(b).)

Reference Obligations and makes payments to Paragon based on the amount of interest and reinvestment earnings generated by the Reference Obligations. (RB's 56.1 ¶¶ 71, 75; PSA Conf. 1, 12-15.) This cash flow is then distributed by Paragon to its noteholders pursuant to the terms of the Indenture. (RB's 56.1 ¶ 76; Indenture § 11.1.) Under certain conditions, Paragon and Rabobank New York, as Portfolio Manager and Paragon's "Designee," can change the composition of the Reference Portfolio by directing Rabobank London, as the Paragon Swap Counterparty, to sell and replace Reference Obligations. (PSA Conf. 6, 22-23.) Paragon bears financial exposure to any changes in the market value of the Reference Portfolio resulting from these sales. (RB's 56.1 ¶¶ 79-80.) Specifically, in the event that Rabobank were to sell Reference Obligations below their notional value, Paragon must compensate Rabobank for the loss. (*Id.*) Conversely, if Rabobank were to sell any Reference Obligations above their notional value, Rabobank would have to pay Paragon any gains on the sale. (*Id.*; *see also* PSA Conf. 12-15.)

The PSA also requires Paragon to assume the credit risk of the Reference Portfolio, which is the risk that a Reference Obligation might default or be written down. (RB's 56.1 ¶ 77.) Whenever any of the Reference Obligations experience certain negative "Credit Events," as defined in the PSA, Paragon must pay Rabobank a "Loss Payment Amount." (*Id.*; PSA Conf. 20.) Since Paragon only issued $125 million worth of notes, Paragon's financial obligations to Rabobank were capped at approximately the first $125 million of losses from the $1 billion Reference Portfolio, subject to certain adjustments. (BONY's 56.1 ¶ 14.)

To secure the remaining $875 million worth of liabilities that Rabobank held under the Paragon Swap Agreement, Rabobank entered into a senior credit default swap agreement with LaCrosse – the LaCrosse Swap Agreement – which was guaranteed by MBIA. (*Id.*) In exchange for a periodic fee paid by Rabobank, LaCrosse and MBIA agreed to provide Rabobank with a subsequent layer of protection on the performance of the Reference Obligations up to $875 million that would come due after Paragon's payments depleted the roughly $125 million First Loss Amount.[4] (Pls.' 56.1 ¶ 16; LSA Conf. 9.)

b. Sales of Reference Obligations under the Paragon Swap Agreement

As noted above, the Paragon Swap Agreement generally permits Paragon or Rabobank New York to modify the composition of the Reference Portfolio. (*See* PSA Conf. 6-8.)

The PSA restricts those rights after the Trustee declares an Event of Default under the Indenture. Specifically, the parties may no longer direct the sale of Reference Obligations that have not experienced significant changes to their credit quality. (*See* PSA Conf. 6-7 (defining Discretionary Removals)). However, the Paragon Swap Agreement permits Paragon or Rabobank New York to continue selling certain poorly-performing Reference Obligations even after default. (*Id.* at 8.) As relevant to this case, "at any time" through October 20, 2044, Paragon or Rabobank New York may direct the sale of Reference Obligations that have not yet declined to the point of a Credit

[4] Specifically, the First Loss Amount consists of (i) $125 million, (ii) plus any amount maintained by Paragon in a reserve account, (iii) plus any "Net Removal Gains," or minus any "Net Removal Losses." (LSA Conf. 9.)

Event but are at "significant risk" of doing so. (*Id.*) Each such sale is referred to as a Credit Impaired Removal. (*Id.*)

A Credit Impaired Removal is initiated when either Paragon or Rabobank New York provides written notice to Rabobank London and BONY of their "intention to make a Removal." (*Id.* at 6.) The notice must designate the sale as a Credit Impaired Removal, and identify each Reference Obligation to be sold from the Reference Portfolio and its adjusted notional value. (*Id.*) Rabobank London is required to "promptly" forward this notice, along with any other non-duplicative notices received under the Paragon Swap Agreement, to LaCrosse. (*See* LSA Conf. 11.) Finally, to effectuate the sale, Rabobank London, as the party that actually owns the Reference Obligations under the Paragon Swap Agreement, must request firm bids from at least five independent dealers and sell the Reference Obligations to the highest bidder. (PSA Conf. 6.)

c. MBIA's Post-Default Rights

After an Event of Default is declared, the Trustee is required to "retain the Collateral securing the Notes intact." (Indenture § 5.5(a).) At that point, BONY may only permit the "Collateral" to be sold if (i) it determines that the anticipated proceeds of a sale would be sufficient to discharge the amounts due on the notes and MBIA, as the "Controlling Class," agrees with that determination, or (ii) MBIA directs the sale and liquidation of the Collateral. (*Id.*)[5] The principal issue in this case is whether the Reference Obligations are included in the Indenture's definition of Collateral, such that the Trustee is required to obtain MBIA's consent to authorize Rabobank New York to sell Credit Impaired Reference Obligations after a default.

MBIA obtains several other rights after default, including the right to remove the Portfolio Manager (*see* PMA § 11(c)) and the right to direct the Trustee to conduct "any Proceeding for any remedy available to the Trustee for exercising any trust, right, remedy or power conferred on the Trustee in respect of the Notes" (Indenture § 5.13). The parties agree that this right enables MBIA to affirmatively direct the Trustee to abstain from selling Reference Obligations. (*See* Pls.' Opp'n 30; RB's Opp'n 2.)[6]

3. The Event of Default and Subsequent Sales of Reference Obligations

On March 3, 2009, the Trustee declared an Event of Default under the Indenture. (RB's 56.1 ¶ 83.) Subsequent to that announcement, Rabobank and MBIA entered discussions regarding a potential restructuring of this CDO and other transactions. (Pls.' 56.1 ¶ 48.) During these negotiations, Harjan Kuiper, the head of portfolio management at Rabobank's New York branch, informed Anthony McKiernan, managing director of MBIA, that Rabobank had the right to "reduce the subordination," meaning a sale of Reference Obligations that would decrease the First Loss Amount cushion and accelerate MBIA and LaCrosse's obligations. (*See* Affidavit of Harjan Kuiper, dated April 15, 2010, Doc. No. 43 ("Kuiper Aff.") ¶ 23; RB's 56.1 ¶ 48.) MBIA does not directly dispute that this statement was made.[7]

---

[5] As defined in the Indenture, MBIA is the Controlling Class. (Pls.' 56.1 ¶ 23.)

[6] Each party's opening memorandum of law is cited as "Mem.", with subsequent responsive briefing cited as "Opp'n".

[7] MBIA claims that Rabobank never informed it that Rabobank "disagreed with MBIA's *position* that Rabobank's right to remove Reference Obligations

On July 9, 2009, Rabobank, acting as Portfolio Manager, notified BONY that it intended to direct the removal of certain Credit Impaired Obligations from the Reference Portfolio. (RB's 56.1 ¶ 93; Kuiper Aff. ¶ 14.) In response, BONY instructed Rabobank not to sell any Reference Obligation while its counsel reviewed the propriety of the sales. (RB's 56.1 ¶ 94.) Subsequently, on July 14, BONY stated to Rabobank that the Credit Impaired Removals were "permitted," but required Rabobank to certify that the Reference Obligations were properly classified as Credit Impaired under the Paragon Swap Agreement, and that Rabobank obtained five firm bids from five independent dealers for each Credit Impaired Obligation. (*Id.* ¶ 96; Kuiper Aff. ¶ 17 & Ex. A.)

Beginning on July 22, 2009 and continuing through August 17, 2009, Rabobank made the required certifications to BONY and sold Reference Obligations with a notional amount of approximately $114 million for proceeds of approximately $9 million, resulting in $105 million in losses. (RB's 56.1 ¶ 98; Affidavit of Anthony McKiernan, dated May 11, 2010 Doc. No. 46 ("Second McKiernan Aff.") ¶¶ 25-26 & Exs G – J.) Notwithstanding the notice provisions contained in the CDO Transaction Documents, Plaintiffs did not learn of these sales until receiving the Trustee's August 31, 2009 periodic report. (Pls.' 56.1 ¶ 55.)

The recognition of these losses substantially depleted the First Loss Amount, and eventually caused Plaintiffs to begin making credit protection payments to Rabobank under the LaCrosse Swap Agreement. (RB's 56.1 ¶ 100.) The instant dispute over the propriety of the July/August sales followed.

### B. Procedural History

Plaintiffs filed the Complaint on December 9, 2009, bringing claims for breach of contract, declaratory judgment, and a permanent injunction against Rabobank, BONY, and Paragon, and negligence against BONY. Defendants answered on January 15, 2010. By way of a joint letter filed on January 29, 2010, the parties indicated their intent to pursue motions for judgment on the pleadings or summary judgment without the need for discovery. Plaintiffs filed the instant motion for summary judgment on March 15, 2010, and Defendants filed their cross-motions on April 15, 2010. Briefing was completed by June 4, 2010. In all, the parties' papers and attachments in connection with the motions exceed 1,800 pages. On March 7, 2011, the Court held oral argument on the motions.

## II. Standard of Review

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Bronx Household of Faith v. Bd. of Educ.*, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of

---

from the Portfolio had been suspended by the Event of Default, and that Reference Obligations could not be sold without the consent of MBIA as the Controlling Class." (First McKiernan Aff. ¶ 54; Pls.' RB Opp'n 56.1 ¶ 85.) However, MBIA does not explain when, if ever, MBIA specifically *expressed* that position *to Rabobank* prior to the July/August sales. (*See* RB's 56.1 ¶ 86; Pls.' RB Opp'n 56.1 ¶ 86.) Instead, MBIA generally asserts that it has "*always* been MBIA's *expressed* position that Reference Obligations could not be removed by Rabobank from the Reference Portfolio following an Event of Default without MBIA's consent, as set forth in the unambiguous terms of the Transaction Document." (Pls.' RB Opp'n 56.1 ¶ 86 (emphasis added).)

showing that it is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (citation and internal quotation marks omitted); *accord Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Accordingly, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (citation and internal quotation marks omitted) (alteration in original).

Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral summary judgment motion. *See Straube v. Fla. Union Free Sch. Dist.*, 801 F. Supp. 1164, 1174 (S.D.N.Y. 1992). "That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts." *U.S. Underwriters Ins. Co. v. Roka LLC*, No. 99 Civ. 10136 (AGS), 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000); *see also Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988).

## III. Discussion

### A. Breach of Contract

There are four elements to a breach of contract claim under New York law: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). In determining a party's obligations under a contract, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000) (citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994)). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) (citation omitted). Thus, if the "resolution of the ambiguity hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court, should decide what meaning is to be ascribed to the contract." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148-49 (2d Cir. 1993) (citations omitted). However, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'" *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).

Finally, when a transaction involves multiple writings that "form part of a single transaction and are designed to effectuate the same purpose, [they] must be read together, even though they were executed on different dates and were not all between the same parties." *See TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005) (citation omitted). There is no question here that the Transaction Documents entered into on November 24, 2004 in connection with the formation of this CDO were part of a single, integrated transaction, and along with the parties, the Court reads them together. *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *Wachovia Bank Nat. Ass'n v. EnCap Golf Holdings, LLC*, 690 F. Supp. 2d 311, 331 (S.D.N.Y. 2010).

Plaintiffs assert that the July/August sales violated MBIA's consent and notice rights over the sale of Reference Obligations after a default. Because the notice and consent rights implicate largely distinct arguments and provisions of the Transaction Documents, the Court addresses these claims in turn.

1. The Consent Claim

The principal dispute between the parties is whether the Trustee's post-default authorization of the sale of Reference Obligations in July and August 2009 constituted a "sale of Collateral" requiring MBIA's consent pursuant to Section 5.5(a) of the Indenture. Section 5.5(a) provides, in relevant part:

> Notwithstanding anything to the contrary herein, if an Event of Default shall have occurred and be continuing, *the Trustee shall retain the Collateral securing the Notes intact*, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of Article X, Article XII and Article XVI *unless*:
>
> (a) the Trustee, pursuant to Section 5.5(c), determines that the anticipated proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due and unpaid on the Notes . . . and [MBIA] agrees with such determination; or
>
> (b) [MBIA] . . . direct[s] such sale and liquidation of the Collateral.

(Indenture § 5.5(a) (emphasis added).)

As the dominant argument in their papers, Plaintiffs insist that the Reference Obligations are Collateral as that term is defined in the Indenture, and that Defendants' sale of those securities violated BONY's duty to "retain the Collateral securing the Notes intact" absent MBIA's consent. (Pls.' Mem. 13-17.) Alternatively, Plaintiffs contend that the Trustee could not authorize a sale of Reference Obligations because the right to control or approve such a sale is *itself* part of the Collateral and is exhausted upon the sale of Reference Obligations. (Pls.' Opp'n 9-10.) Finally, Plaintiffs argue that Rabobank's power to initiate Credit Impaired Removals was automatically revoked upon default under Section 15.1(a) of the Indenture. (*Id.* 2, 12.)

Although Rabobank is not a signatory to the Indenture, Plaintiffs also seek to hold it

liable for breaches of the Indenture under Sections 2(b) and 2(e) of the Portfolio Management Agreement.[8] (Pls.' Mem. 7.) Plaintiffs argue that Rabobank's sales of Reference Obligations in the midst of the parties' negotiations about restructuring MBIA's interests under the CDO transaction demonstrate "bad faith, gross negligence or willful misconduct" sufficient to overcome the Portfolio Management Agreement's exculpatory clause. (*Id.* 18-21; *see* PMA§ 5(a).)

For the reasons set forth below, the Court holds that under the unambiguous terms of the contracts, the July/August sales of Reference Obligations did not violate MBIA's consent rights under Section 5.5(a).

a. The Reference Obligations are Not Collateral

The Court finds that the Reference Obligations do not constitute Collateral under the Indenture. The Indenture's Granting Clauses, which define Collateral,[9] grant to the Trustee "any and all" property "owned" by Paragon, including all "right, title and interest in . . . all accounts, general intangibles, payment intangibles, securities accounts, chattel paper, instruments, investment property, [and] money." The grant also includes, without limitation:

(a) the [Paragon] Swap Agreement and [Paragon's] rights thereunder, and all payments made or to be made thereon or with respect thereto and any collateral granted to [Paragon] thereunder;

(b) the Portfolio Management Agreement and [Paragon's] rights thereunder;

(c) the Repurchase Agreement . . .;

(d) the Collateral Administration Agreement . . .;

(e) the Repo Eligible Investments . . . and Eligible Investments;

(f) the Interest Collections Payment Account, the Principal Collections Payment Account, the Repo Account, the Swap Posted Amount Account or any other account of the Issuer, Eligible Investments purchased with funds on deposit in said accounts . . .;

(g) the Hedge Agreements . . .;

(h) all Cash and Money delivered to the Trustee for the benefit of the Secured Parties (directly or through a Securities Intermediary or bailee);

(i) all securities, loans, investments and agreements of any nature in which the Issuer has an interest, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto; and

---

8 Section 2(b) of the Portfolio Management Agreement obligates Rabobank to "comply with the Swap Agreement, the Indenture and [the Portfolio Management Agreement] affecting the duties and functions that have been delegated to it thereunder and hereunder in good faith . . . ." Section 2(e) prohibits Rabobank from taking any action "knowingly and intentionally, or with reckless disregard for its obligations [under the PMA] . . . which would result in the Issuer or the Co-Issuer violating the terms of the Swap Agreement or the Indenture . . . ."

9 (*See* Indenture, Definitions ("Collateral" "[has] [t]he meaning specified in the Granting Clauses hereto."))

(j) all Proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses;

(Indenture, Granting Clauses.)

While the Granting Clauses are undeniably broad in granting the Trustee any property and rights Paragon "owned" under the derivative contracts, their nearly two-page iteration of Collateral, which enumerates interests far smaller in value than the $1 billion pool of Reference Obligations, clearly omits the Reference Obligations themselves.[10] The absence of the Reference Obligations from the Granting Clauses is particularly conspicuous in a one-hundred-fifty-four-page Indenture that otherwise invokes "Reference Obligations" sixty-eight times in numerous sections affecting the parties' rights. *See Sterling Investor Servs., Inc. v. 1150 Nobo Assocs., LLC*, 818 N.Y.S.2d 513, 516 (App. Div. 2006) ("Under accepted canons of contract construction, where certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional." (citing *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 233 (1986))); *see also Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (App. Div. 2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." (quoting *Rowe v Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, (1978))).

[10] For example, the Granting Clauses enumerate smaller grants of securities such as the Repo Eligible Investments and Eligible Investments. (*See* Indenture § 1.1 at 13-14, 25-26 & Schedule 3.)

Although Plaintiffs strenuously argue that the itemizations are non-exhaustive, and implicitly include Reference Obligations within their description of "securities" and Paragon's rights under the PSA and PMA, the dispositive fact before the Court is that under the terms of the Indenture, Paragon cannot grant any interest in Reference Obligations it does not own. (*See* Indenture § 3.2(c) (requiring Paragon to certify to BONY at closing that "with respect to assets pledged to the Trustee for inclusion in the Collateral . . . the Issuer is the owner of such asset free and clear of any liens, claims or encumbrances of any nature whatsoever . . ."); *id.* § 14.13(b) (setting forth Paragon's representation and warranty that it "owns and has good and marketable title to the Collateral free and clear of any lien, claim or encumbrance of any Person.")) Indeed, if the Reference Obligations themselves were Collateral, Paragon's claim of clear title would conflict with *Rabobank's* ownership interest. (PSA Conf. 1.)

In this synthetic CDO, Paragon plainly acquired market and credit *exposure* to the performance of the Reference Obligations by virtue of certain derivative contracts referencing them, not to mention other contractual rights to direct Rabobank to change the composition of the Reference Portfolio. But the language of the Transaction Documents makes clear that Paragon did not acquire an interest in the Reference Obligations themselves. The PSA and LSA acknowledge that the Reference Obligations are owned by Rabobank:

> [Rabobank London] *shall own each of the Reference Obligations included in the Reference Portfolio* (including any Reference Obligation added to the Reference Portfolio after the Effective Date); provided,

> however, [Rabobank London] may hedge, pledge, hypothecate or enter into any derivative or repurchase transaction with respect to any Reference Obligation so long as [Rabobank London] retains all credit exposure with respect to each Reference Obligation . . . .

(PSA Conf. 1; LSA Conf. 1 (emphasis added).)

The Portfolio Management Agreement further confirms the parties' intent to omit Reference Obligations from the meaning of Collateral. Like the Indenture, the Portfolio Management Agreement does not list Reference Obligations in its description of "collateral security for the Notes," which includes "the [Paragon] Swap Agreement, certain Hedge Agreements, Eligible Investments and certain other assets." (PMA Conf. 1.)

Plaintiffs contend that Rabobank's ownership of the Reference Obligations is irrelevant because the Uniform Commercial Code ("UCC"), which is referenced in the definition of various forms of Collateral listed in the Granting Clauses, allows parties to acquire a security interest in collateral even where title rests elsewhere. *See* N.Y. UCC § 9-202. Thus, as a matter of Paragon's ability to attach a security interest to the Reference Obligations under the UCC, Plaintiffs argue that Paragon need not have title to the Reference Obligations. *See id.* § 9-203(b) cmt. 6 ("A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach.").

The Court has no quarrel with that observation, but the relevant inquiry here is not whether Rabobank *could have* granted Paragon any interest in the Reference Obligations themselves while maintaining ownership of the same, but whether it *actually* did. Consistent with basic principles of conveyance, Paragon must have obtained some interest in the Reference Obligations in order to transfer that interest to BONY. *See In re Emergency Beacon Corp.*, 665 F.2d 36, 40 (2d Cir. 1981) ("Notwithstanding any agreement between the debtor and the creditor, if the debtor has no rights in the collateral, no security interest in that collateral comes into existence."). Accordingly, to prevail on their Section 5.5(a) claim, Plaintiffs must (i) demonstrate what, if any, interest or right, Paragon has in the Reference Obligations that would constitute Collateral, and (ii) show that a sale of Reference Obligations constitutes an alteration or impairment of that interest.

To trace Paragon's interest in the Reference Obligations under the Paragon Swap Agreement, Plaintiffs point to the Granting Clauses' inclusion of Paragon's "rights" and "payments" pursuant to the Paragon Swap Agreement, and "any collateral granted to [Paragon] thereunder." (*See* Pls.' Mem. 15.) However, Plaintiffs fail to identify any provisions in the Paragon Swap Agreement itself, such as a Credit Support Annex, securing in Paragon a collateral interest in the Reference Obligations themselves. Instead, Part 5(17) of the Schedule to the PSA contemplates that upon a short-term downgrade of Rabobank's own credit rating, it may be required to post certain unconditional guarantees, letters of credit, bonds, or insurance policies, or upon a decline of Rabobank's long-term credit rating, pre-pay the periodic interest earnings installment. These provisions do not create any collateral rights in the Reference Obligations themselves, and absent any other language in the PSA doing so, the Court cannot

conclude that Plaintiffs acquired any such interest.

Plaintiffs' failure to identify Paragon's source or scope of rights in the Reference Obligations themselves proves fatal to their remaining arguments. For example, Plaintiffs contend that Paragon's "interest" in unspecified "securities" and "investment property" under the Granting Clauses must include Reference Obligations because Reference Obligations are "securities." (Pls.' Mem. 2.) However, the mere fact that securities may be Collateral does not mean that the Reference Obligations are Collateral simply because they happen to be securities.

For similar reasons, the Court is unpersuaded that Section 15.1(a)'s "collateral[] assign[ment]" to the Trustee of "[Paragon's] interest in all securities, monies and proceeds held by the Portfolio Manager thereunder" proves Paragon's interest in the Reference Obligations themselves. (*See* Pls.' Mem. 15-16 (quoting Indenture § 15.1(a)).) Plaintiffs' argument with respect to this provision again requires the Court to infer – without more – that because Reference Obligations are "securities," they must be subject to Paragon's interest.[11] Moreover, nothing in the text of Section 15.1(a) or the Portfolio Management Agreement bestows a threshold interest in Reference Obligations on Paragon that could in turn be transferred to the Trustee.

Plaintiffs further rely on Section 5.5(c) of the Indenture. (Pls. Mem. 15-16.) This provision sets forth the steps the Trustee must take to determine that the proceeds of a sale or liquidation of Collateral would be sufficient to pay all outstanding amounts due to Paragon's noteholders pursuant to Section 5.5(a)(i). Because Section 5.5(c) requires BONY to obtain bids for each *Reference Obligation* to compute the proceeds of the sale or liquidation of Collateral, Plaintiffs contend that Reference Obligations must be Collateral. The Court disagrees.

In essence, Plaintiffs argue that because a sale of Collateral entails the sale of Reference Obligations, the sale of Reference Obligations must entail the sale of Collateral. However, the Court finds that requiring the Trustee to obtain price information "for each Reference Obligation contained in the Reference Portfolio" upon a sale or liquidation of Collateral, as Section 5.5(c) does, is consistent with the fact that any valuation of the Paragon Swap Agreement, which *is* Collateral, would depend on the value of the Reference Obligations. The Trustee's authorization to retain an independent investment banking firm "for the purposes of determining issues relating to the market value of the Reference Obligations and the execution of a sale or other liquidation thereof" is likewise consistent with the fact that Reference Obligations may be sold off upon a sale or liquidation of the Paragon Swap Agreement. (Indenture § 5.5(c).)

Although the Court finds no need to resort to extrinsic evidence to resolve the unambiguous terms of the Transaction Documents as they pertain to any grant of interests in the Reference Obligations themselves, it is worth noting that the extrinsic evidence proffered by the parties favors Defendants' position. Specifically, the Offering Memorandum to the Paragon CDO explicitly states that: "[T]he [Paragon] Swap Agreement does not constitute a purchase or other *acquisition or assignment*

[11] It further bears noting that nothing in the Portfolio Management Agreement indicates that as part of its "advisory services," the Portfolio Manager – rather than the Paragon Swap Counterparty – holds any Reference Obligations, or any money or proceeds generated by the Reference Obligations. (*See* PMA § 2(a).)

*of any interest in any Reference Obligation*. The Issuer and the Trustee, therefore, will have rights solely against [Rabobank] in accordance with the [Paragon] Swap Agreement and will have no recourse against any Reference Obligation." (Fenrich Decl., Ex. K at 53 (emphasis added).)

Accordingly, as it must, the Court declines Plaintiffs' invitation to impliedly read a $1 billion asset into the Granting Clauses' otherwise extensive and detailed definition of Collateral or insert language in Section 5.5(a) equating the sale of Reference Obligations with the sale of Collateral. *See Vt. Teddy Bear*, 1 N.Y.3d at 475 ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."). While Paragon granted the Trustee its broad rights in derivative contracts that are clearly measured by the value and performance of the Reference Obligations, this grant is independent of an interest in the Reference Obligations themselves.

b. The Control and Approval Right

Plaintiffs at times include both, "Reference Obligations *and the right to control or approve the sales of the Reference Obligations*" in their proffered definition of Collateral and contend that by allowing the sale, the Trustee failed to retain the control right intact. (Pls.' Mem. 9, 14, 17) (emphasis added).) The Court finds that to the extent this right derives from those granted in the Paragon Swap Agreement, the relevant right is not to "control or approve sales," but rather a concurrent right with Rabobank New York to "direct" Rabobank London to undertake the removals. (*See* PSA Conf. 6.) More importantly, if the right to approve sales of the Reference Obligations constituted Collateral, the Trustee's *exercise* of that right in permitting the July/August sales did not exhaust the right itself. Section 5.5(a) requires the Trustee to retain the Collateral intact "unless" MBIA consents to or directs the "sale or liquidation of Collateral." Accordingly, absent some suggestion that the Trustee sold or liquidated the disposition right itself, the Court declines to reconceptualize the meaning of Collateral in Plaintiffs' favor.

The parties to this $1 billion CDO are highly sophisticated financial actors with significant expertise in fields relevant to this transaction. If the parties wished to maintain the synthetic structure of this CDO but nonetheless impose the same substantial restrictions on the post-default disposition of Reference Obligations that Plaintiffs now seek to draw from Section 5.5(a), they had ample drafting options. Rather than restricting the Trustee's post-default duty to retain only the Collateral intact – and then omitting Reference Obligations from the definition of Collateral – the parties could have easily included an explicit restriction on post-default sales of Reference Obligations in Section 5.5(a). Without having done so, Plaintiffs now essentially ask the Court to conclude that the *exercise* of a *contractual right* afforded by the Paragon Swap Agreement to change the composition of the Reference Portfolio – such right itself being Collateral – means that the Trustee has sold or liquidated the *right* by selling the Reference Obligations.

As recognized by a court in this District in rejecting an interpretation hinging on an "opaquely" buried consequence, "[t]hese are carefully structured documents with intricately interwoven and balanced duties and rights. They spell out the parties' obligations in exquisite detail. They exert minute control over the Collateral Manager and the Trustee." *Cooperatieve Centrale*

*Raiffeisen-Boerenleenbank, B.A. v. Brookville CDO I Ltd.*, No. 08 Civ. 9565 (DLC), 2008 WL 5170178, at *12 (S.D.N.Y. Dec. 10, 2008). In the absence of contractual text setting forth Paragon's collateral interest in the Reference Obligations themselves or otherwise restricting the Trustee's ability to authorize a change in the composition of the Reference Portfolio post-default, the Court finds that the July/August sales did not constitute a sale of Collateral requiring consent under Section 5.5(a).

c. Rabobank's Power to Initiate Credit Impaired Removals was not Suspended by an Event of Default

At oral argument, Plaintiffs developed an alternative argument that, apart from whether Reference Obligations constitute Collateral, Section 15.1(a)'s revocation clause automatically suspends the Portfolio Manager's power to sell Reference Obligations after default.[12] (*See* March 7, 2011 Oral Argument Transcript ("Tr.") 8:8 – 11:19.) The Court disagrees. Section 15.1 transfers to the Trustee "the right to do any and all other things whatsoever that the Issuer is or may be entitled to do [under the Portfolio Management Agreement]." (Indenture § 15.1(a).) Paragon is then given a "license to exercise all of the *Issuer's rights* pursuant to the Portfolio Management Agreement without notice to or the consent of the Trustee" until an Event of Default, which "automatically revoke[s]" the license. (*Id.* (emphasis added).) Plaintiffs have not demonstrated how the revocation and transfer to the Trustee of *Paragon's* "license to exercise of all the *Issuer's* rights" under the PMA automatically suspends Rabobank's authority to exercise its duties. A natural reading of this clause provides that after default, the Trustee can exclusively exercise rights previously held by Paragon, including the right to take legal action against the Portfolio Manager and the right to receive all notices and requests for consent that Rabobank New York formerly sent to Paragon.

Furthermore, an interpretation of § 15.1(a) as automatically terminating Rabobank's post-default rights would be plainly inconsistent with the Paragon Swap Agreement's differentiated treatment of Credit Impaired and Discretionary Removals. Specifically, while an Event of Default terminates the Portfolio Manager's power to direct sales of Reference Obligations that had not yet experienced significant changes to their credit quality (*see* PSA Conf. 6-7), Rabobank may continue to direct sales of Credit Impaired Obligations from the Reference Portfolio "at any time." (*Id.* at 8.) Finally, to the extent Plaintiffs suggest that Rabobank New York is automatically removed as Portfolio Manager and Paragon's Designee after default, that reading finds no basis in Section 15.1(a) or the explicit termination provisions of the PMA. (*See* PMA § 11.)

[12] Plaintiffs devoted the entirety of two sentences and a parenthetical in their opening brief to this argument. *See* Pls.' Mem. 2 ("Second, the Indenture makes clear that Rabobank's rights as Portfolio Manager (which includes the right to sell the Reference Obligations) is automatically 'revoked upon the occurrence of an Event of Default'"); *id.* at 23 ("This conclusion is confirmed by the provisions in Section 15.1 of the Indenture which automatically revoke Rabobank's 'license' as Portfolio Manager upon an Event of Default"); *id.* at 11-12 ("such rights are restricted by the terms of the Indenture, including Section 5.5(a) and Section 15.1 (revoking the powers of Rabobank as Portfolio Manager upon an Event of Default)"). Plaintiffs appeared to abandon the argument in their opposition brief, which cited Section 15.1(a) solely for the proposition that Paragon's grant of securities "held by the Portfolio Manager" referred to the Reference Obligations, before resurrecting it in oral argument.

Accordingly, for the reasons stated above, the Court finds that the Trustee did not breach the conditions set forth in Section 5.5(a) of the Indenture by permitting the July/August sales and that Rabobank is not secondarily liable for this alleged breach. The Court thus denies Plaintiffs' motion for summary judgment on its breach of contract claim for lack of consent and grants Defendants' cross-motions for summary judgment on the same.

2. Notice Claim

As Paragon's Designee under the Paragon Swap Agreement, Rabobank New York is obligated to provide specific notice of its intention to direct the removal of Reference Obligations to Rabobank London. (*See* PSA Conf. 6.) The London branch must in turn "promptly" forward this notice, along with any other non-duplicative notices it receives under the Paragon Swap Agreement, to LaCrosse. (*See* LSA Conf. 11.) Rabobank concedes that its New York branch failed to send the required notices to its London branch, which resulted in the London branch's failure to notify Plaintiffs. (Tr. 40:1-3, 56:19-57:5; RB's Opp'n 3.) As a result, MBIA and LaCrosse did not learn of the July/August sales until they received a copy of a periodic Trustee's report from BONY, dated August 31, 2009. (Pls.' 56.1 ¶ 55.) Plaintiffs bring a breach of contract claim against Rabobank for violation of the Indenture and the LaCrosse Swap Agreement.[13] (Compl. ¶¶ 60, 85.)

The unambiguous notice provisions in the contemporaneously-entered swap agreements provide MBIA and LaCrosse with the opportunity to be informed about events that may deplete the roughly $125 million First Loss Amount and accelerate their own obligations. These notice protections assume particular importance after an Event of Default has occurred in light of MBIA's rights to subsequently remove the Portfolio Manager (*see* PMA § 11(c)) and affirmatively direct the Trustee to abstain from making Credit Impaired Removals (*see* Indenture § 5.13; Pls.' Opp'n 30; RB's Opp'n 2-3.) MBIA exercised both rights on September 16, 2009. (*See* First McKiernan Aff., Ex. H; Second McKiernan Aff., Ex. C.)

Rabobank argues that it is entitled to summary judgment because (i) it did not act in "bad faith, gross negligence or willful misconduct" to warrant liability under the PMA's exculpatory clause (*see* PMA § 5(a)), and (ii) there was no breach under the LSA, which does not contain an exculpatory clause, because the party subject to that agreement – Rabobank London – never received notice from the New York branch and therefore had nothing to provide to LaCrosse. (RB's Opp'n 3.)

For the reasons set forth below, the Court denies the parties' motions for summary judgment on the notice claim.

As an initial matter, Rabobank's liability under the LaCrosse Swap Agreement is not

[13] Plaintiffs' secondary theory of liability under the Indenture is premised on *Paragon's* duty to verify that a proposed Credit Impaired Removal "would comply with the requirements under the [Paragon Swap Agreement] . . . [and] notify the Trustee, the Swap Counterparty [Rabobank London], and the Portfolio Manager [Rabobank New York] of the results of its verification." (Indenture § 12(f)(iii).) Plaintiffs argue that Rabobank New York had a duty to ensure that Paragon timely and accurately issued this verification under Section 2(a)(vi) of the Portfolio Management Agreement, making it liable for any breach of the notice provision. (Pls.' Opp'n 6.) Because the Portfolio Management Agreement more directly imposes on Rabobank New York a duty to provide Rabobank London with notices of Credit Impaired Removals as Paragon's Designee (PSA Conf. 6), the Court need not analyze this alternate theory of liability at this time.

automatically precluded by the New York branch's failure to send notice to the London branch. It is well established that a "party to a contract 'cannot rely on the failure of another to perform a condition precedent where [the party itself] has frustrated or prevented the occurrence of the condition.'" *A.H.A. Gen. Constr., Inc. v. N.Y. City Hous. Auth.*, 92 N.Y.2d 20, 31 (1998) (quoting *Kooleraire Serv. & Installation Corp. v Bd. of Educ.*, 92 N.Y.2d 20, 31 (1971) (internal quotations omitted); *accord Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007); *see also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 212 (2d Cir. 2002) (noting that a party to a contract with a condition precedent has "an implied obligation not to do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract or to act in such a way as to frustrate[] or prevent[] the occurrence of the condition" (quotation marks and citations omitted) (alterations in original)). The doctrine of prevention is especially applicable where a party's action or inaction did not merely frustrate the contractual performance of a third party, but of itself. *Cf. In re Bankers Trust Co.*, 450 F.3d 121, 129 (2d Cir. 2006) ("BT did not know of Semi-Tech's defaults because it failed to take the steps it had promised it would take to learn of defaults. Its failure to fulfill its affirmative duty to inspect the certificates 'unjustly prevent[ed] the performance' of its duty to give notice of the nonconformities." (quoting *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966))).

According to the terms of the swap agreements, upon Rabobank New York's notice and direction to its London branch that a specific removal of Reference Obligations should take place, it is the London branch's duty – as the entity that actually owns the Reference Obligations – to request bids from at least five dealers and sell the obligations to the highest bidder. (PSA Conf. 6.) In the present case, Rabobank New York was able to effectuate sales of the Reference Obligations without providing notice to the London branch. To the extent the record indicates that, in light of Rabobank's dual roles as Portfolio Manager and Paragon Swap Counterparty, Rabobank London actively waived notice or abdicated certain functions to the New York branch in a way that vitiated the notice requirement, Plaintiffs may prevail under the LaCrosse Swap Agreement itself.

The pre-discovery record before the Court renders this inherently factual inquiry premature. Specifically, the record does not indicate whether Rabobank previously complied with their notice obligations, the state and scope of any controls and procedures it set up to meet those obligations, their general internal interactions to effectuate sales of Reference Obligations, and any specific communications between the New York and London branches concerning the July/August sales.[14] Accordingly, the Court denies the parties' cross-motions for summary judgment on the notice claim under the LaCrosse Swap Agreement, without prejudice to renewal at the completion of discovery.

Similarly, the determination of Rabobank's liability under the Portfolio Management Agreement presents factual inquiries inappropriate for resolution on the instant record. As noted above, the

[14] The Court notes that the record contains a single internal Rabobank e-mail, dated August 4, 2009, received by an employee in the London branch among other recipients, indicating that Paragon sales were taking place. (*See* Second McKiernan Aff., Ex. K.)

limitation of liability clause of the PMA provides:

> The Portfolio Manager . . . shall not be liable to the Co-Issuers, the Trustee, the Holders of the Securities or any other Person for any losses . . . that arise out of or in connection with the performance by the Portfolio Manager of its duties under this Agreement, or of any of its Affiliates or agents, except by reason of action taken or omitted constituting bad faith, gross negligence or willful misconduct.

(PMA § 5(a).)

Under New York law, gross negligence is defined as "'conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing.'" *AT&T. v. City of N.Y., et al.*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (1993).) Typically, "a mistake or a series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence." *Id.*; *see Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 555, 583 (1992). As a general matter, determinations as to bad faith, recklessness, and intent are factual inquiries that are more appropriately resolved by the fact-finder. *See, e.g.*, *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 400 (2d Cir. 2000) (finding bad faith analysis presented a question of fact); *Quickie, LLC. v. Medtronic, Inc.*, No. 02 Civ. 1157 (GEL), 2004 WL 74309, at *2 (S.D.N.Y. Jan. 15, 2004) (finding willful infringement an "issue[] of fact for trial"); *Charter Oak Fire Ins. Co. v. Trio Realty Co.*, 99 Civ. 10827 (LAP), 2002 WL 123506, at *5 (S.D.N.Y. Jan 31. 2002) ("issue of gross negligence is ordinarily a question of fact for a jury to determine").

In arguing that Rabobank acted in bad faith or with reckless disregard for Plaintiffs' rights, Plaintiffs point to (i) Rabobank's sale of $114 million of Reference Obligations that nearly depleted the First Loss Amount without notice to MBIA, despite the fact that the parties were contemporaneously negotiating a restructuring of MBIA's interests under the same CDO transaction; (ii) Rabobank's failure to provide notice to its London branch even though that branch was required to execute the sales; and (iii) Rabobank's removal of Reference Obligations during a single monthly Trustee reporting period – rather than spread out over several reporting periods – which had the effect of ensuring that MBIA could not discover the sales and act to block them until after the fact. (Pls.' Opp'n 33-35.)

Rabobank disputes that it intended to conceal the sales. Relying primarily on Harjan Kuiper's June 1, 2009 comment that Rabobank had the right to "reduce the subordination," Rabobank argues that it gave practical notice of the sales and cannot be liable for any bad faith under the PMA. (*See* RB's Opp'n 2-4.) However, a comment about Rabobank's general *ability* to make Credit Impaired Removals would not preclude a finding that Rabobank acted in bad faith if the record demonstrates that it intentionally withheld notices of its *actual* substantial sales of Reference Obligations more than a month and a half later in order to prevent MBIA from exercising its rights or in reckless disregard of those rights.

Because such issues cannot be resolved without discovery, the Court denies the parties' cross-motions for summary

judgment on the notice claim without prejudice to renewal after discovery.

B. Remaining Causes of Action

Because Plaintiffs' remaining causes of action for negligence, declaratory judgment, and permanent injunction are based entirely on the consent claim denied above, the Court grants Defendants' motions for summary judgment on these claims.[15]

III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied in its entirety, BONY's motion for summary judgment is granted in its entirety, and Rabobank's motion for summary judgment is granted in part except as to Plaintiffs' breach of contract claim for failure to receive notice of the sales of Reference Obligations. By Monday, April 25, 2011, Plaintiffs and Defendant Rabobank shall submit to the Court a proposed case management plan and scheduling order with respect to the discovery remaining to be taken on the notice claim. A template for the order is available at http://www1.nysd.uscourts.gov/judge_info.php?id=99. The Clerk of the Court is respectfully directed to terminate the motions located at document numbers 28, 36, and 41.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 25, 2011
New York, New York

* * *

Plaintiffs are represented in this matter by Michael Nicholas Abdo, Howard Robert Hawkins, Jr., and William J. Natbony, Cadwalader, Wickersham & Taft, One World Financial Center, New York, NY 10281. Defendant BONY is represented by Robert Lynch Dunn and Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036. Defendant Rabobank is represented by William Joseph Fenrich, Michael Stuart Scheinkman, and Daniel Jacob Schwartz, Davis Polk & Wardwell L.L.P., 450 Lexington Avenue, New York, NY 10017.

[15] These claims are also deficient as a matter of law. Specifically, the negligence claim is fatally duplicative of Plaintiffs' breach of contract claim because it alleges no violation of an independent duty by BONY to the Plaintiffs. (*Compare* Complaint ¶¶ 74-86 (setting forth the breach of contract claim), *with id.* ¶¶ 91-92 (recasting the same conduct as "negligent[] and willful"); *see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389-90 (1987). Likewise, the declaratory judgment claim is coupled with a coercive breach of contract claim on the same issue and would not "serve a useful purpose in clarifying and settling the legal relations in issue . . . or . . . terminat[ing] and afford[ing] relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992); *see Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) ("[A] declaratory judgment would not further clarify legal relations among the parties; the determination sought . . . will already be addressed in the breach of contract claim.") Finally, Plaintiffs cannot demonstrate an entitlement to a permanent injunction to prevent future sales of Reference Obligations without their consent in the absence of an adequate remedy at law and irreparable harm. *See N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989). Here, MBIA has already directed Paragon to terminate and remove Rabobank as Portfolio Manager and directed BONY to refrain from any further sale of the Reference Obligations. The parties do not dispute that BONY has followed MBIA's direction and has not authorized any other changes in the composition of the Reference Portfolio.